■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES D. PATTERSON, Appellant.—Appeal by defendant from a judgment of the County Court, Orange County, rendered December 9, 1977, convicting him of murder in the second degree and robbery in the first degree, upon a jury verdict, and imposing sentence. Judgment affirmed. The main issue on this appeal is whether defendant's statements to the police should have been suppressed as the product of an illegal arrest. On Friday, November 19, 1976, at about 7:30 P.M., defendant went to the Neighborhood Police Unit of the Newburgh Police Department. Without identifying himself, he stated to the officer on duty, Police Officer Foland, that earlier that day he had seen the "Williams boys" abduct an elderly man and his car and drive in the direction of Marlboro. Defendant further stated that later that day he saw the car on Chamber Street and Gidney Avenue, but he did not see the elderly man in the vehicle. The officer sent for a patrol car and defendant accompanied Officer Potter to Chamber Street and Gidney Avenue. When the car was spotted, defendant, a parolee, wishing to avoid trouble, exited the patrol car and departed. Officer Potter, having no reason to hold defendant, allowed him to go. Early the next morning, Saturday, November 20, 1976, the body of the owner of the car, one Dallas Picket, was discovered in a cemetery in the Town of Newburgh. He had been robbed and beaten. Detective Philip Ginquitti of the of the Newburgh Police Department, upon learning of the defendant's identity, went to defendant's residence accompanied by a State Police investigator. Defendant spoke to the police officers in

---

front of his house and stated that he was nervous because one of the Williams boys was inside and had made threats warning him to keep his mouth shut. As a result of this exchange, Williams was arrested and defendant was taken to headquarters to give a statement. At approximately 9:35 P.M., after being in the station house for approximately two hours, defendant made a written statement to the police implicating the Williams brothers in the murder and robbery of Dallas Pickett, and he specifically denied his participation in the crime. No *Miranda* warnings were given because, according to the police, defendant was not under arrest. After making the statement, however, defendant did not go home but was "sequestered" in a motel. At his request, his wife was permitted to spend the night with him, while a police officer was stationed outside of the door. Detective Ginquitti testified at the *Huntley* hearing that defendant "was being held as a material witness on the recommendation of the District Attorney's Office", and was to take a polygraph examination the following day. Further questioning elicited the following from Detective Ginquitti: "Q. At that time was Mr. Patterson under arrest? A. I had not arrested him, no. Q. Had anybody in your presence formally placed Mr. Patterson under arrest for either the homicide or as a material witness, or for a violation of parole, or for anything? A. Not to my knowledge. Q. But at that point, he was not free to go home? A. He was talked to about a polygraph the following day and that I had a conversation with the Assistant District Attorney present, and then he was informed that we wanted him to stay in a motel overnight. During the conversation, he asked if his wife would be present and that was permitted, and he went to the motel." Detective Ginquitti further testified that, at this point, he did not have probable cause to arrest defendant and that defendant was a witness, not a suspect. Defendant was told that the police wanted him to take the polygraph examination to be certain that what he told them was the truth. The following day, at about 8:30 A.M., defendant was fingerprinted and then transported by Detective Ginquitti to the Middletown State Police Barracks to take the polygraph examination. He was turned over to Investigator Richard Ovens, the polygraph operator. Ginquitti was then called back to Newburgh police headquarters. However, prior to leaving he arranged for another Newburgh police officer to replace him at the barracks "in case [defendant] failed the polygraph examination". Investigator Ovens administered what he called "a participating Miranda" to the defendant. This consisted of the standard *Miranda* warnings and also included notice to the defendant that he was free to leave at any time, even in the middle of a statement. After receiving an explanation of how the polygraph examination worked, but before the test actually began, defendant said that he had made a few mistakes in the statement he had given the police the previous evening. He indicated that he was in the victim's car when the Williams brothers were beating the victim and that they had intended to rob the victim when they left the City of Newburgh. Defendant thereafter refused to take the polygraph examination and Investigator Ovens called Detective Ginquitti. At about 1:45 P.M., Detective Ginquitti returned to the barracks and gave defendant his *Miranda* warnings. Defendant indicated that he understood his rights and waived the presence of a lawyer. He then told the officer that he had left two things out of his earlier statement: that he had been drinking with the Williams brothers and that he was with them when they dumped the body. Further questioning elicited other incriminating statements. Defendant was thereafter transported back to the station house for the purpose of reducing his statements to writing. At the police station

defendant requested an attorney and all questioning immediately ceased. Defendant argues on this appeal that he was illegally detained when he was first picked up at his house on Saturday, November 20, 1976 and that consequently all statements made thereafter should have been suppressed as the fruit of the illegal arrest. We do not agree. Our analysis begins with an examination of whether the defendant's Fifth Amendment rights were infringed. He asserted at the *Huntley* hearing that his statements at the station house had been induced by promises and threats made by the police. The prosecution's witnesses, however, denied that any threats or promises had been made, and the court credited their testimony. We conclude that the court's finding was amply supported by the record and should not be disturbed (see *People v Leonti*, 18 NY2d 384). Since the statements at the station house were made without benefit of *Miranda* warnings, we must next determine whether those statements were the product of custodial interrogation. In deciding whether defendant was in custody at the station house, we are not concerned with his subjective beliefs. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position (see *People v Yukl*, 25 NY2d 585, cert den 400 US 851). That the defendant was in a police station does not, by itself, spell out custody (see *People v Pugliese*, 26 NY2d 478). Here the defendant had approached the police voluntarily to report a crime. When the police appeared at his home, he expressed fear of one of the "Williams boys", and on the defendant's word, Williams was arrested. The defendant, on the other hand, was taken to the station house as a witness and was treated as such. The purpose of his presence was to enable him to reduce to writing the account he had earlier volunteered to the police. In our view, then, it cannot be said as a matter of law that an innocent individual in defendant's position would have reasonably considered himself to be in custody at the time he gave exculpatory statements to the police on the evening of Saturday, November 20 (see *People v Yukl, supra; People v Pugliese, supra; People v Palumbo*, 65 AD2d 443). Thus, the absence of *Miranda* warnings does not preclude the use of those statements at trial. Since all statements made by the defendant the next day followed his waiver of *Miranda* rights, no Fifth Amendment objection to their introduction at trial could be made. Accordingly, we conclude that there was no violation of defendant's Fifth Amendment rights. Nevertheless, our inquiry may not end there, for a statement, admissible under Fifth Amendment standards, must still be suppressed if found to be the product of a Fourth Amendment violation (see *Brown v Illinois*, 422 US 590). Although the police termed as "sequestering" their holding the defendant overnight in a motel, we conclude that it constituted a custodial detention for Fourth Amendment purposes and was illegal since it was carried out in the absence of probable cause (see *Dunaway v New York*, 442 US 200). Given the Fourth Amendment violation, we must then determine whether the statements made after the arrest must be suppressed as the fruits of the illegal detention (see *Wong Sun v United States*, 371 US 471). In making such a determination, we apply the test enunciated in *Brown v Illinois (supra)*. There the United States Supreme Court held that the giving of *Miranda* warnings, although an important factor, does not necessarily dissipate the taint of an illegal arrest. The court identified the following additional factors as relevant to the determination (pp 603-604): the temporal proximity of the arrest and the statement, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. In the instant case, we note first that defendant was

twice advised of his *Miranda* rights. His first incriminating statement was separated from his illegal detention by a period of some 16 hours. In the interim, he spent the night in the privacy of a motel room in the company of his wife. This opportunity for unhurried consultation with his spouse is a significant intervening event. And finally, the official misconduct here was neither flagrant nor undertaken for an improper purpose. The defendant had voluntarily come to the police in the first instance in the guise of a witness to a very serious crime. Later, he had expressed a reluctance to get involved fearing an adverse effect on his parole status and trouble from the persons he had accused. The police can hardly be faulted for trying to insure the availability of a reluctant witness to a brutal murder. Moreover, the police did not act rashly by holding the defendant in a detention facility. Instead, they first consulted the District Attorney's office, and on its recommendation, they checked the defendant into a motel and immediately acceded to his request to be joined by his wife. It should also be noted that, the next day, when the defendant requested an attorney, the police immediately stopped all questioning. Weighing all these factors, we conclude that the statements made by the defendant were not excludable as the product of the illegal arrest. Accordingly, the motion to suppress was properly denied (see *People v Martinez,* 37 NY2d 662). We have considered defendant's other contentions and we find them to be without merit. Mollen, P. J., Damiani, Mangano and Martuscello, JJ., concur.