No. 64,225

STATE OF KANSAS, *Appellee*, v. JAMES F. FRITSCHEN, *Appellant*.

(802 P.2d 558)

Opinion filed December 7, 1990.

*Michael L. McCoy*, assistant appellate defender, argued the cause, and *Shannon S. Crane*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Michael E. Cleary*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, James F. Fritschen, from his convictions for one count of rape and two counts of first-degree murder. Fritschen's appeal concerns whether the confessions he gave should have been suppressed. The facts are essentially undisputed.

Janice Hough and Lee Richardson lived in Hough's house in Newton. On April 10, 1988, Hough and Richardson were found stabbed to death in the house. Richardson had been stabbed 23 times; Hough had been stabbed 10 times and raped. Through interviews with neighbors and friends, the authorities determined that Fritschen had previously lived in Hough's home and had been to her house late on April 9. The authorities were also aware that Fritschen frequently carried a knife.

On April 13, two Kansas Bureau of Investigation (KBI) agents, Bill Mueller and Floyd Bradley, interviewed Fritschen at Fritschen's residence in Hutchinson, Kansas, while two other agents talked to Fritschen's wife. Fritschen willingly talked with the agents and told them that on Friday, April 8, he had brought his wife to her sister's house in Newton and, after dropping her off, had gone to see a friend, Clarence Williams. He told the agents he stayed there until 10:30 p.m. and had gone to see Hough and Richardson at Hough's house for about 30 minutes before he returned to Hutchinson. He told the agents that on Saturday evening he did go to Newton, but he claimed that he did not go to Hough's that evening—that he went bowling, then to a club, then to visit a friend, then to visit another friend, who turned out not to be home, then to Charlie's Restaurant, and then home.

Fritschen told the agents that he did own a knife, but that he did not know where it was. Fritschen signed a consent to search the house, allowed the agents to seize some knives and clothing, and later gave them finger and palm prints. The next day Fritschen agreed to allow a physician hired by KBI agents to examine scratches the agents had noticed on his upper body. The results of the examination of the scratches were inconclusive. After being advised of his *Miranda* rights, Fritschen agreed to provide a blood sample.

Nine days later, KBI Agent Bradley contacted Fritschen, and Fritschen agreed to come to the Hutchinson Law Enforcement Center after work. Later, Fritschen called and said he did not have enough gasoline to make it, but he agreed to let the agents give him a ride.

Agents Mueller and Bradley went to Fritschen's house and gave him a ride to the Center. Fritschen was not arrested or

handcuffed. Upon arriving at the Center, Fritschen was advised of his *Miranda* rights and told that he was free to leave. At first, Fritschen told the same story he had told on April 13. The agents confronted him with statements by other witnesses, but Fritschen claimed they were wrong.

Fritschen eventually told the agents that he wanted to see a lawyer. Bradley and Mueller ended the interview. Fritschen asked how he could get in touch with the agents, and they gave him a card with their phone numbers on it and started to take him home. On their way out of the building, the agents' supervisor, George Schureman, stopped them, asked where they were going, asked if anything had been cleared up, and then asked if Fritschen would mind talking to him. Schureman was not aware that Fritschen had asked to talk to a lawyer.

Fritschen agreed to talk to Schureman, and the two went into an interview room. Schureman told Fritschen that in similar cases many people were able to justify the crimes in their minds and it was important for Fritschen to straighten things out. Fritschen told Schureman that he wanted to talk to Mueller again. Fritschen also asked Schureman to get him a pack of cigarettes.

When Schureman left the interview room, Mueller told Schureman that Fritschen had said he wanted to talk to a lawyer. Schureman returned with the cigarettes and told Fritschen that, because he had requested a lawyer, the agents could not talk to him unless he requested them to. Schureman also said that if laboratory tests came out positive, Fritschen would be arrested. The agents allowed Fritschen to sit in the interview room alone for several minutes (as long as 11 minutes).

Fritschen called for Mueller to come back into the interview room and said to Mueller, "I hope you can understand my position. I want to tell you what I can." Mueller, as had Schureman, advised Fritschen that he did not have to talk to him and that he had a right to a lawyer. At some point, Bradley reentered the room. Fritschen started talking without the agents asking questions.

Fritschen told the agents that his initial version of what had happened on Saturday, April 9, was correct up to the point when he went home from Charlie's Restaurant. He told the agents that after he left the restaurant he again went past a friend's house,

but that she was not home yet. He then told the agents that the next thing he remembered was driving back to Hutchinson with his shirt off, blood on his chest and arms, and his survival knife lying on the seat beside him with blood on it.

Fritschen told the agents he drove home and went to bed. The next morning, he discovered there was still blood on his chest and arms, and also on his thighs. He told the agents he took a shower and went back to bed. He told the agents that later Sunday he noticed the scratches on his body and went out and threw the knife in the trash, which was later taken to the landfill. Fritschen told the agents that he assumed he had committed the murders, but did not remember doing so.

After the initial interview by the agents, the agents prepared a written statement which Fritschen read and signed. Following these statements, Mueller and Bradley contacted the Harvey County Attorney, and Fritschen was placed under arrest several hours later.

Three days later, on April 25, while in the Harvey County Jail, Fritschen was interviewed by Harvey County Sheriff's Detectives Motter and Jolliff. They advised him of his rights and he agreed to talk to them. The officers told Fritschen they knew he had given a statement to KBI agents, but they wanted to know the details of what really had occurred.

Fritschen told the officers that when he went to Hough's house, she answered the door, and they had a conversation in the living room. Fritschen said a confrontation developed and Hough slapped him. Fritschen said he "went off" and started to hit her. Fritschen told the officers that Richardson woke up and came out of a bedroom, so he stabbed Richardson with a knife.

Fritschen told the officers that these things would not have happened if he had not been drunk. The officers asked Fritschen if he could see himself in his mind stabbing Hough and Richardson and if he could see them lying dead in the bedroom. Fritschen became upset and nodded his head. He told the officers he would go crazy if he remembered any more of it. He told officers that he could remember Hough trying to pull him off Richardson while he was stabbing Richardson.

Because Fritschen was having difficulty telling about the incident, he agreed to answer questions by nodding his head to

questions the officers asked. The officers elicited the following scenario: Richardson retreated to the bedroom; Fritschen followed and continued to stab him; Hough tried to pull Fritschen off, so he lashed out at her; she ran to the front door, but Fritschen forced her back to the bedroom and stabbed her several times; he then laid her on the floor, cut off her pants, and had sexual intercourse with her; after this, Fritschen went home.

After the officers elicited this information, Fritschen agreed to let the officers write out a statement, which he read and signed.

Other evidence at trial showed that there were several types of blood found on Hough's shirt and the types were consistent with her blood and that of Richardson and Fritschen. Two magazine covers found near Richardson's body had Fritschen's palm print on them.

Prior to trial, Fritschen moved to have these two confessions suppressed, arguing they were involuntary and taken after he had requested consultation with counsel. In particular, Fritschen argued that his Fifth and Sixth Amendment rights were violated during the April 22 interview when Schureman initiated a conversation after Fritschen had requested an attorney.

The trial court, in refusing to suppress the confessions, found:

"A. The Defendant was not in custody until the close of his April 22, 1988 statements.

"B. Agent George Schureman was not part of the investigation and his statements did not amount to a continuation of Agent Mueller's and Agent Bradley's interrogation.

"C. The Defendant reinstigated contact with Agent Bill Mueller.

"D. The commencement of the April 25, 1988 interrogation was a voluntary act on the part of the Defendant."

At trial, Fritschen objected to the introduction of the statements he made on April 22 and April 25. The objections were overruled. He was convicted and this appeal followed.

Fritschen argues that his Fifth and Fourteenth Amendment rights were denied during the April 22 interview when questioning was recommenced after he asked for an attorney. He argues that the subsequent interrogation on April 25 is tainted by this first allegedly improper confession and the resultant confession should also be excluded.

As an aside, Fritschen's Sixth Amendment right to counsel is not at issue as it attaches only after the commencement of adversary judicial proceedings. *Brewer v. Williams*, 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232, *reh. denied* 431 U.S. 925 (1977).

Prior to any custodial interrogation, a defendant must be warned of his or her constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). If the defendant

"indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda*, 384 U.S. at 444-45.

Here, the question is whether Fritschen was in custody. Fritschen argues that he was in custody because of where he was interrogated and because he was the focus of the investigation at the time of his interrogation. As noted above, *Miranda* only applies if the interrogation was custodial. In *Miranda* the Court was concerned with the especially coercive atmosphere inherent to custodial interrogations.

The determination of whether interrogation was custodial is made on a case-by-case basis. *State v. Lucas*, 243 Kan. 462, 474, 759 P.2d 90 (1988), *aff'd on reh.* 244 Kan. 193, 767 P.2d 1308 (1989). On appeal, an appellate court will not reverse a determination that a confession was freely, voluntarily, and intelligently given if there is substantial competent evidence to support the determination. *State v. Alexander*, 240 Kan. 273, 282, 729 P.2d 1126 (1986). Although the facts do not necessarily show that Fritschen was the focus of the investigation, even if he was, the interrogation was not custodial.

That a person is the focus of an investigation was one of the factors considered by the United States Supreme Court in *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964). *Escobedo* was a Sixth Amendment case in which the defendant had been denied his right to counsel. The Court said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry

out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment . . . ." 378 U.S. at 490-91.

*Miranda,* however, did not adopt the *Escobedo* focus test. In fact, in *Miranda,* which held that Fifth Amendment rights attach with custodial interrogations, the Court reinterpreted *Escobedo* to put the emphasis there on the custodial nature of the interrogation. 384 U.S. at 465-66. In *Miranda,* the Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. The Court then added in a footnote, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." 384 U.S. at 444 n.4. In discussing *Miranda,* Judge Friendly said of this footnote, "[T]he one thing that is undeniable is that the opinion said that focus means custody, not that custody means focus." *United States v. Hall,* 421 F.2d 540, 543 (2d Cir. 1969), *cert. denied* 397 U.S. 990 (1970).

Any question whether the "focus" test survived *Miranda* was put to rest in *Beckwith v. United States,* 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976). In *Beckwith,* the defendant had been questioned by IRS agents, but was told during questioning that he was not under arrest. Later, after he was convicted partly on the basis of statements he had made during questioning, he argued that he had not been given proper *Miranda* warnings and the interrogation was custodial because he was the focus of the investigation. 425 U.S. at 345.

The Court held:

"Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* court as the basis for its holding. *Miranda* specifically defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S., at 444. (Emphasis supplied.) It may well be true, as petitioner contends, that the 'starting

point' for the criminal prosecution was the information obtained from petitioner and the records exhibited by him. But this amounts to no more than saying that a tax return signed by a taxpayer can be the 'starting point' for a prosecution." 425 U.S. at 347.

What is "custodial interrogation" then? The next several Supreme Court cases on custodial interrogation, after *Beckwith*, adopted a very formalistic approach. In *Oregon v. Mathiason*, 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977), the defendant's parole officer requested that the defendant come to the police station to discuss with the officer a recent burglary. The officer told the defendant he was not under arrest. The defendant confessed to the burglary. 429 U.S. at 493-94.

The Court held that the mere fact that the questioning was coercive did not make it custodial. The Court said:

"In the present case . . . there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station where he was immediately informed he was not under arrest. . . .

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because . . . the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . . *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " 429 U.S. at 495.

Implicit in *Mathiason* is that an objective standard is used to judge whether an interrogation is custodial.

In *California v. Beheler*, 463 U.S. 1121, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983), the Court again held that where a suspect voluntarily went to the police station and was told he was free to leave, there was no custodial interrogation. The Court said: "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' . . . the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quoting *Mathiason*, 429 U.S. at 495). See *Minnesota v. Murphy*, 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136, *reh. denied* 466 U.S. 945 (1984).

More recently, the United States Supreme Court has expressly stated that an objective analysis is used to determine whether an interrogation is custodial. In *Berkemer v. McCarty*, 468 U.S. 420,

82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984), the Court held that a routine traffic stop does not involve custodial interrogation. In so holding, the Court said "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." 468 U.S. at 442.

The "reasonable person" test has been mentioned twice by the Supreme Court since *Berkemer*. In *Maine v. Thibodeau*, 475 U.S. 1144, 90 L. Ed. 2d 343, 106 S. Ct. 1799 (1986), the Supreme Court noted that the Maine Supreme Court had set forth six factors for analyzing whether an interrogation is custodial, including "the subjective belief of the defendant." 475 U.S. at 1145. The Court denied *certiorari* and Chief Justice Burger dissented, saying: "In *Berkemer* we noted that 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.' [Citation omitted.] The Maine court eschewed this objective test, substituting instead the 'subjective belief of the defendant.' " 475 U.S. at 1146.

The *Berkemer* decision was next mentioned in *Pennsylvania v. Bruder*, 488 U.S. 9, 102 L. Ed. 2d 172, 109 S. Ct. 205 (1988), which factually was nearly identical to *Berkemer*. The Court cited *Berkemer*, saying that a routine traffic stop is normally noncustodial because it is in a far less coercive atmosphere than the kinds of interrogation at issue in *Miranda*, and the motorist's freedom of action is not curtailed to a degree associated with formal arrest. 488 U.S. at 10.

In Kansas, the analysis for determining whether an interrogation is custodial has developed through a long line of post-*Miranda* cases, without significant reference to any post-*Miranda* United States Supreme Court cases. In *State v. Phinis*, 199 Kan. 472, 430 P.2d 251 (1967), we took a formalistic approach, holding that custody began when the defendant was taken to the police station and informed she was in custody. See *State v. Porter*, 201 Kan. 778, 443 P.2d 360 (1968), *cert. denied* 393 U.S. 1108 (1969).

In *State v. Carson*, 216 Kan. 711, 533 P.2d 1342 (1975), we set forth five factors to be used in analyzing whether an interrogation was custodial: " '(1) the nature of the interrogator; (2) the nature of the suspect; (3) the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress

of the investigation at the time of interrogation.' " 216 Kan. at. 715 (quoting Annot., 31 A.L.R.3d 565).

The court also discussed the relevance of the focus of an investigation:

"The question whether an investigation has focused on a suspect as derived from *Escobedo* [citation omitted] is not the wholly determinative test whether the suspect is in custody. The fact the suspect is the focus of the investigation, standing alone, does not trigger the need for a *Miranda* warning [citations omitted]. Nonetheless, the fact the investigation has focused on a particular individual is still frequently one of the determinative factors in arriving at a decision whether a *Miranda* warning is required." 216 Kan. at 715.

*State v. Frizzell*, 207 Kan. 393, 485 P.2d 160 (1971), (holding that a suspect is not in custody until the investigation reaches an "accusatory stage") and *Carson* (with the five-factor analysis) have become the leading Kansas cases on custodial interrogations. All subsequent cases in Kansas cite either *Frizzell* and/or *Carson*, or later cases containing the rules stated in *Frizzell* and/or *Carson*. See *State v. Lucas*, 243 Kan. 462; *State v. Roadenbaugh*, 234 Kan. 474, 673 P.2d 1166 (1983); *State v. Taylor*, 234 Kan. 401, 673 P.2d 1140 (1983); *State v. Price*, 233 Kan.. 706, 712, 664 P.2d 869 (1983); *State v. Taylor*, 231 Kan. 171, 642 P.2d 989 (1982); *State v. Costa*, 228 Kan. 308, 613 P.2d 1359 (1980); *State v. Edwards*, 224 Kan. 266, 579 P.2d 1209 (1978); *State v. Miller*, 222 Kan. 405, 565 P.2d 228 (1977); *State v. Bohanan*, 220 Kan. 121, 551 P.2d 828 (1976). The most recent Kansas case on custodial interrogations is *State v. Jones*, 246 Kan. 214, 787 P.2d 726 (1990). In *Jones*, we again relied entirely on previous Kansas cases, including the "accusatory stage" analysis. 246 Kan. at 216.

Absent from any of these cases is discussion of later United States Supreme Court cases. For instance, neither *Beckwith* nor *Berkemer* have ever been cited.

The current Kansas analysis is not entirely consistent with United States Supreme Court decisions. The second factor listed in *Carson*, "the nature of the suspect," is in conflict with United States Supreme Court cases. In *Berkemer*, the Court said the proper analysis is how a reasonable person in the suspect's position would have understood the situation. This implies an objective standard. In his dissent in *Thibodeau*, quoted above, Chief

Justice Burger expressly said that the Court intended an objective standard in *Berkemer.*

The majority rule is that an objective analysis is used. This is the position that the Tenth Circuit has adopted. In *U.S. v. Chalan*, 812 F.2d 1302 (10th Cir. 1987), the court reviewed recent Supreme Court cases on custodial interrogations and concluded under the facts therein at issue: "We believe that this information, under the circumstances of this interview, would lead a reasonable person to think that he would be free to leave." 812 F.2d at 1307.

New York has adopted an objective analysis. In *People v. Patterson*, 73 App. Div. 2d 922, 924, 423 N.Y.S.2d 499 (1980), the court said: "In deciding whether defendant was in custody at the station house, we are not concerned with his subjective beliefs. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position."

There is justification for an objective analysis. In *Commonwealth v. Comolli*, 14 Mass. App. 607, 612, 441 N.E.2d 536 (1982), the court said:

"To emphasize a defendant's purely subjective feelings about 'custody,' without considering the reasonableness of those feelings, would allow issues to turn not on the objective circumstances of the questioning, but on personal idiosyncrasies which are neither within the control of, nor necessarily observable by, investigating personnel. The law imposes no burden on the police to divine a suspect's subjective impressions."

One of the better and more pragmatic analyses of the problem is provided by Judge Friendly. In *Hall*, 421 F.2d 540, after noting that neither the defendant nor the police officer who conducted the interrogation were asked about their subjective views of the interrogation, Judge Friendly said:

"The Court could scarcely have intended the issue whether the person being interrogated had 'been taken into custody or otherwise deprived of his liberty in any significant way' to be decided by swearing contests in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they considered themselves to be significantly deprived of their liberty the minute officers began to inquire of them. Moreover, any formulation making the need for *Miranda* warnings depend upon how each individual being questioned perceived his

situation would require a prescience neither the police nor anyone else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize *Miranda*'s concern with the coercive effect of the 'atmosphere' from the point of view of the person being questioned.

"The test must thus be an objective one." *Hall*, 421 F.2d at 544.

We believe the standard to be used in Kansas is the objective standard of a reasonable person.

There remains the question of what factors should be examined. In Kansas, under both *Frizzell* and the fifth factor in the *Carson* analysis, the fact that the defendant was the focus of the investigation was considered to be either relevant or determinative. The relevance of the focus of the investigation was dispensed with, or at least minimized, in *Beckwith*. Further, the fact that a suspect is the focus of an investigation would be relevant under the reasonable person/objective standard if the suspect was aware he was the focus of the investigation, and a reasonable person in the suspect's position would have felt that because of this he was in custody.

One court suggested the following factors:

"At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning." *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

We do not believe it necessary or prudent to set forth hard and fast factors to be examined. Each case needs to be analyzed on its own facts. Factors present in one case will not be present in another. Further, listing factors, "one two three four five," implies that each factor bears equal weight. However, in differing cases, the importance of each factor varies.

In this case, Fritschen voluntarily went to the police station for the April 22 interview. He was informed he was not under arrest and that he was free to go. Only two officers were present, and all the testimony shows that their interviewing tactics were low-key. They did not yell at or threaten Fritschen. They did not handcuff or physically restrain Fritschen in any way. At one point, the officers started to take him back home. He was consistently and at appropriate times told he could consult a lawyer and that such a request would be honored.

Agent Schureman testified that he did not interrogate Fritschen concerning the crime and, when he learned that Fritschen had expressed a desire to consult with counsel:

"I went back in the room where Jim was and asked Jim if he had requested to speak with an attorney. And he said yes. And I told him at that point that he had put Bill in a position where Bill felt he couldn't talk to him unless Jim initiated the conversation and stating that he wanted to talk to Bill. And at that point I told Jim that he could get an attorney before he was going to speak to Bill, I told him that he was not under arrest, I told him that he was free to go if he wanted to, in fact that we would take him home, and I told him that he could speak to Bill if he wanted to but in order for him to do that he was going to have to request it. And at that point I asked him if he wanted to think over just what I told him, those things that I told him, and he said he did. I asked him what kind of cigarettes he was smoking and he said Marlboro 100's. They didn't have that type in the Law Enforcement Center there and I told him there was a table and a couple of chairs there, I asked him to sit down, think it over, and I would go get him some Marlboro 100's while he was thinking it over and I would be back. And so, I left, the door was open, he was sitting in the chair there. I went two or three blocks away to a Stop and Shop, one of those quick shop places that had Marlboro cigarettes, came back to the Law Enforcement Center, went downstairs where Jim was, the door was still open, Floyd and Bill were still in the conference room, I laid the package of cigarettes down on the table in front of Jim. I didn't say a word, turned around, walked into the room where Floyd and Bill were, and we waited, I don't know, several minutes anyway. And at that point in time, why, Jim requested to talk to Bill."

In response to a question concerning his purpose in talking to Fritschen after he learned Fritschen had expressed a desire to talk to counsel, Schureman testified:

"My purpose for going back into the room the second time was to let him know that Bill Mueller, under the existing circumstances, could not talk to him, that he was, himself, going to have to ask Bill to go in there

and talk to him. That's the reason we went back in there. And if he did, I wanted him to be sure that he understood his rights and that he wasn't under arrest, that he was free to go and we would take him to go home if that's what he wanted and that he was free to talk to an attorney before he did talk to Bill."

Agents Bradley and Mueller had earlier told Fritschen that he was not under arrest and that he was free to leave at any time and that he could consult a lawyer. Fritschen signed a waiver of his *Miranda* rights.

Bradley and Mueller again, after Fritschen talked to Schureman and then stated he desired to talk to them, told him he was free to go and that he had a right to counsel and that if the defendant requested it, they would take him home. Fritschen then gave an incriminating statement.

The record contains evidence to amply support the trial court's findings that Fritschen was not in custody and that the defendant reinstigated contact with Agent Mueller after he expressed a desire to consult with an attorney. A reasonable person would have understood he was not in custody and was free to leave at any time.

From our examination of the record, we find no evidence that Schureman acted other than in good faith in talking to Fritschen after Fritschen expressed a desire to confer with counsel. Obviously, the two agents should have immediately informed Schureman of Fritschen's desire to consult with counsel. Here, Fritschen did not make any incriminating statements to Schureman. Thus, the issue becomes whether this court should adopt an absolute rule that once a defendant requests counsel, even in a noncustodial setting, the defendant cannot reinitiate communication with law enforcement people. We have long permitted an accused to waive the right to counsel. *State v. Johnson,* 223 Kan. 237, 243, 573 P.2d 994 (1977); *State v. Taylor,* 217 Kan. 706, 538 P.2d 1375 (1975). A waiver can be implied where warranted under the facts of a particular case. See *North Carolina v. Butler,* 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979); *United States v. Hilliker,* 436 F.2d 101, 102 (9th Cir. 1970), *cert. denied* 401 U.S. 958 (1971).

Here, defendant had every reason to believe his request would be honored. When he expressed a desire to consult an attorney,

the interrogation was immediately terminated and the agents started to take him home. He was not pressured to give up his right to counsel or right to silence and it was made abundantly clear to him that he would have to reinitiate communication if he desired to speak to Agent Bradley. He was advised he was free to go and would be taken home upon request and of his right to counsel. When he reinitiated conversation and expressed a desire to speak to Agent Bradley, he was again advised he was free to leave and of his right to counsel.

Based on the facts before us, the trial court did not err in holding the confession of April 22 to be admissible in evidence.

Fritschen next argues that, because his confession of April 22 was improper, his second confession on April 25 was tainted. This argument fails because the first interrogation was not custodial and the resulting confession was admissible in evidence.

Fritschen next argues he invoked his right to remain silent at the April 25 interrogation and that this right was ignored by the officers, who took a second confession.

At the outset of the April 25 interview, Fritschen was advised of his *Miranda* rights, and he made a valid waiver of them. At one point during the interview, Fritschen made some indication that it hurt too much to talk about the murders. At the motion to suppress, Officer Byron Motter testified that Fritschen said, "I don't want to talk about it any more, it hurts too much." Fritschen argues that this was an assertion of his right to remain silent.

Motter said that he interpreted this statement to mean that Fritschen was not invoking his right to silence, just that he did not want to think about the murder. Fritschen was upset at this point and was obviously having a hard time talking about the victims. At trial, Motter testified that the officers asked Fritschen if he could continue answering questions by nodding yes or no, and Fritschen agreed. His answers were reduced to writing and he signed the statement.

At the pretrial suppression hearing, the court said, "I am inclined to think . . . that the reason that he didn't want to talk was not the invocation of the *Miranda* right but merely because the situation and subject matter was so painful to him that he couldn't visualize it without extreme upset."

The issue here is whether Fritschen asserted the right to remain silent. In *Miranda,* the Supreme Court recognized that an assertion of *Miranda* rights may not always be clear. The Court said, "If [defendant] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent." 384 U.S. at 485.

In *Smith v. Illinois,* 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984), the Court recognized that a statement may be ambiguous as to whether a suspect is asserting his rights. The Court said that in determining whether the statement itself is ambiguous, only prior statements and the statement itself may be looked at. 469 U.S. at 100. Postrequest statements are not relevant.

Because the *Smith* Court held that the statement therein at issue was an unambiguous request for counsel, the Court did not determine the procedure if a statement is ambiguous. The majority rule has been promulgated by the Fifth Circuit, which held that an interrogator may ask questions to clarify whether a suspect is asserting his rights. *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir.), *cert. denied* 444 U.S. 981 (1979). This approach seems compatible with *Miranda.*

In *Crawford v. State,* 580 A.2d 571, 576-77 (Del. 1990), the defendant indicated prior to his arrest that he was seeking an attorney. After arrest, he was *Mirandized* three times and expressed a desire to talk with the police and did not request counsel. The Delaware court held that "the police should be entitled to attempt to determine the suspect's intention . . . . If, however, the police make additional inquiries concerning a suspect's intentions, the clarifying questions may not coerce or intimidate the suspect or otherwise discourage his efforts to secure counsel." The court emphasized that such attempts at clarification must be in good faith and held that, under the facts, the police acted in good faith.

Here, Fritschen's statement does not even reach the level of a potentially ambiguous request to remain silent; Fritschen was saying he was upset and having difficulty talking. Here, even if the request was ambiguous, the officers followed the proper pro-

cedure by inquiring if Fritschen wanted to continue answering questions. Fritschen indicated he did. No error is shown.

During his testimony about his interrogation of Fritschen on April 22, Agent Mueller recounted how Fritschen asked for a lawyer. Fritschen argues that this is impermissible use of post-*Miranda* silence. This interrogation was not custodial. *Miranda* protections had not attached. This was not post-*Miranda* silence. No error is shown. Even if we held it impermissible, it would be of no comfort to defendant. Defendant did not make a contemporaneous objection. In addition, any error would be harmless in that defendant went ahead and gave a statement which was inculpatory, although not complete.

Affirmed.