(870 P.2d 1346)
No. 68,965

STATE OF KANSAS, *Appellee*, v. TODD REIMANN, *Appellant*.
Petition for review denied 255 Kan. 1006 (1994).

Opinion filed March 25, 1994.

*M. Kristine Paredes*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Paul S. Bassett*, assistant county attorney, and *Robert T. Stephan*, attorney general, for appellee.

Before ROYSE, P.J., GREEN, J., and DAVID W. KENNEDY, District Judge, assigned.

KENNEDY, J.: This is a direct appeal by Todd Reimann from his conviction of the second-degree murder of his girlfriend, Theresa Elms. Reimann raises numerous claims of error. We will only address Reimann's claim that the trial court erred by denying his motion for a new trial because the Dodge City police did not give him a *Miranda* warning at the scene of the crime. Reimann also argues that the statements given at the Dodge City police station after a *Miranda* warning was given should also have been suppressed because he did not receive a *Miranda* warning at the scene of the crime. Because we affirm the trial court's ruling that the police did not need to give Reimann a *Miranda* warning at the scene, we need not address this issue. Likewise, we will not explore the State's alternative position that the crime scene statements are admissible because of the exigent circumstances of that situation.

On December 27, 1991, at approximately 1:15 p.m., several officers of the Dodge City Police Department went to Reimann's residence to investigate a report that a person had been shot. Officer Kraft found Reimann in a bedroom. He was holding a rifle between his legs, with his hand on the trigger guard and the barrel pointed toward his face. He was upset and had been crying. When Reimann saw Kraft, he pulled the gun closer to his body, placing the barrel under his chin. Kraft asked why Reimann was upset. He did not respond. Kraft asked for the gun; Reimann did not comply.

Detective Chambers arrived shortly after Kraft found Reimann in the bedroom. Chambers, a 20-year veteran, had special training and experience dealing with hostage negotiations, barricaded subjects, and suicide attempts. During the negotiation period, Reimann allowed Chambers to enter the bedroom where he sat with the rifle. Chambers sat on a chair approximately five feet away from where Reimann was seated. Several other police officers stood outside the bedroom with their guns drawn. Neither Kraft nor Chambers gave Reimann a *Miranda* warning during the negotiations. Chambers talked with Reimann for nearly two hours. She prevented him from shooting himself and eventually persuaded him to surrender the rifle. In the course of their conversation, Reimann told Chambers that he and his girlfriend,

Theresa Elms, were arguing earlier in the day. He told Chambers that he shot Elms while she was in the kitchen and that Elms was dead.

Shortly after the police arrived at the crime scene, the body of Theresa Elms was discovered in the kitchen. Chambers testified that she was not aware a body had been discovered in the kitchen when Reimann told her he had shot and killed Theresa.

After Reimann agreed to surrender the rifle, he was arrested. The police took him to the police station. Approximately 1 hour and 20 minutes later, Chambers gave Reimann a *Miranda* warning. After the warning, Reimann agreed to be interviewed. He gave a detailed account of his relationship with Theresa and of the day's events. Reimann told Chambers he had argued with Theresa about her relationship with another man. Theresa left the bedroom where the argument occurred. Reimann went to his brother's room and retrieved a rifle. He walked to the kitchen where Theresa was standing in front of the sink, pointed the gun at her, and shot her. The coroner's report indicated Theresa died from a brain injury caused by a single gunshot to the head.

Reimann was charged with second-degree murder for the death of Theresa. Reimann was 23 years old when the crime occurred. Theresa was 17 years old.

Reimann has a form of muscular dystrophy called Freidreich's ataxia. It is a disabling disease, causing some deformity in his hands, and making it difficult for him to walk. He testified there is no cure for the disease and that it is progressing in his case.

Reimann testified at the jury trial that he did not intend to shoot Theresa when he walked into the kitchen. He said he was going to shoot Theresa's dog to make her mad, but that when he walked into the kitchen, he lost his balance and the gun discharged accidentally.

This case comes to us in an unusual procedural posture. Reimann's claim on appeal is that the trial court erred when it denied his motion for new trial because Chambers was allowed to testify at trial about what Reimann said at the crime scene and at the police station. Reimann claims the trial court should have suppressed the statements he made to Chambers during the standoff at the crime scene because he was not given a *Miranda* warning. Reimann has not provided us with a transcript of the court's

ruling on his motion to suppress or with a journal entry of the court's ruling.

"The granting of a new trial is a matter of discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of discretion." *State v. Hobson*, 234 Kan. 133, 161, 671 P.2d 1365 (1983); see *State v. Wainwright*, 18 Kan. App. 2d 449, 453, 856 P.2d 163 (1993).

Prior to any custodial interrogation, the defendant must be given the *Miranda* warnings. *State v. Fritschen*, 247 Kan. 592, 597, 802 P.2d 558 (1990). Interrogation is custodial if it is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 247 Kan. at 598. The determination whether there has been a custodial interrogation is made on a case-by-case basis. 247 Kan. at 597.

"*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her 'in custody.' An objective standard is used to judge whether an interrogation is custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation." 247 Kan. 592, Syl. ¶ 2.

An exhaustive discussion of what constitutes an interrogation is contained in *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). Innis had been arrested for the shotgun slaying of John Mulvaney. At the time of his arrest, Innis had requested the presence of a lawyer before he answered any questions. As Innis was being transported to a central police station, he heard two of the officers discussing how dangerous it would be if a child from a nearby school for the handicapped should find the missing shotgun. Innis told the officers he would show them where the gun was hidden. 446 U.S. at 294-95. The parties agreed that Innis was in custody. The question for the Supreme Court to decide was whether there had been an interrogation. 446 U.S. at 298.

"This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the court in *Miranda* noted:

'Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import* of the privilege while an individual is in custody is not whether he is allowed to talk to

the police without the benefit of warnings and counsel, but whether he can be *interrogated.* . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' [Citation omitted] (emphasis added).

"It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." 446 U.S. at 299-302.

Even if Reimann is correct that he was in custody, application of *Innis* to the facts of this case show that the trial court did not err in denying Reimann's motion to suppress. The two police officers who spoke with Reimann asked open-ended questions such as: "What's the matter?" and "What's going on, Todd?" Chambers also asked Reimann about cats and family. Chambers testified that she did not know a body had been discovered in the house until after Reimann admitted that he had shot and killed Elms. Both Chambers and Kraft testified that their purpose in talking with Reimann during the standoff was to prevent him from shooting himself. Chambers testified that an important aspect of hostage or barricade negotiation is that the officer not appear threatening to the suspect and that the officer convey that she does not feel threatened.

When Kraft encountered Reimann in the house, he was visibly upset. He was still upset when Chambers arrived on the scene. Throughout the time that Kraft and Chambers talked with Reimann at the scene of the crime, he held a rifle under his chin or in his mouth. The officers were afraid Reimann would shoot himself. Chambers successfully diffused a potentially explosive

situation using her special skill and training. She was not aware a crime had been committed until Reimann voluntarily confessed to shooting Theresa.

Substantial competent evidence supports a finding that neither Chambers nor Kraft interrogated Reimann within the meaning of *Miranda* and *Innis*. Reimann was not asked questions that were likely to elicit an incriminating statement if he did not want to make one, and the questioning was not the "functional equivalent" of direct questioning after he was in custody.

Reimann's statements made during the standoff were properly admitted. The failure to give a *Miranda* warning was not constitutional error which tainted Reimann's subsequent confession at the police station. Substantial competent evidence supports the trial court's decision that both statements were voluntarily made.

Reimann also argues on appeal that the trial court erred by limiting the testimony of Reimann's expert witness, by denying Reimann's requested instruction on accidental killing, by limiting cross-examination of a prosecution witness, and by denying Reimann's motion for new trial which alleged the State failed to comply with a discovery request. We have reviewed the record and find these arguments to be without merit.

Affirmed.