NOT DESIGNATED FOR PUBLICATION

No. 122,624

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JOE GARCIA WEBSTER III,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed October 9, 2020. Reversed and remanded for further proceedings.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellee.

Before ATCHESON, P.J., BRUNS and POWELL, JJ.

BRUNS, J.: The State appeals from the district court's suppression of a portion of the statements made by Joe Garcia Webster III during an interview with a Reno County Sheriff's detective. The detective interviewed Webster relating to an allegation that he had sex with a woman who was unable to give her consent. Ultimately, Webster was charged with rape and aggravated criminal sodomy. Prior to trial, the district court suppressed certain statements made by Webster in the interview. On appeal, the State contends that the district court erred in suppressing the evidence. For the reasons stated in this opinion, we reverse the district court's decision and remand for further proceedings.

1

On January 23, 2019, Reno County Sheriff's Detective Diana Skomal went to Webster's residence to talk to him about an allegation made by his former girlfriend. Because Webster was not at home, Detective Skomal left a business card and requested that he contact her. Later that day, Webster—who was 21 years old at the time—contacted the detective and arranged to meet her at the Reno County Law Enforcement Center the following morning. Webster drove himself to the law enforcement center for the interview.

To gain access to the law enforcement center, Webster entered through the Reno County Courthouse and made contact with the sheriff's office on a secure telephone. Detective Skomal came to meet Webster and took him through a secured door, down a flight of steps, through a second secured door, and into a room with no windows. Webster sat at a table and Detective Skomal—who was in plain clothes but was wearing a badge—sat across from him to conduct the interview. There were no other officers in the room.

At the start of the recorded interview, Detective Skomal told Webster that he could leave at any time and that he did not have to talk to her. Specifically, the detective told Webster at the outset of the questioning, "You can say I don't want to talk anymore." She also told Webster that he was not under arrest but she simply wanted to give him an opportunity to tell his side of the events. Webster indicated that he understood. The detective did not advise Webster of his *Miranda* rights nor did she advise Webster that any statements he made during the interview might be used against him in the event of prosecution.

During the interview, Webster's demeanor was "conversational" as he responded to Detective Skomal's questions. Similarly, the detective maintained a conversational

tone and never raised her voice during the interview. When Detective Skomal asked Webster if he knew why he was being interviewed, he responded by saying that he knew that someone was accusing him of rape based on what he had seen on social media. Specifically, Webster said "this chick was going around saying that I raped her and all this and was posting it on Snapchat and Instagram and Facebook and that's how I found out . . . ." The Detective asked if he was talking about his former girlfriend, and he acknowledged that she was the one who was saying that he raped her.

Detective Skomal then asked Webster for specifics about the allegations made by his ex-girlfriend. In response, Webster said he and a friend had picked her up from a party at her request. According to Webster, his former girlfriend was intoxicated and appeared to have been smoking marijuana. Webster said he knew that she had been drinking, and she appeared to be "kind of" drunk. However, Webster said that she recognized him and was not slurring her speech. After first spending time at a friend's house, Webster and his friend took his former girlfriend to Webster's father's house.

A little over 16 minutes into the interview, Detective Skomal asked Webster about what happened at his father's house. Webster responded:  "I would rather just . . . I don't know . . .like, I don't want to talk about it." The Detective told Webster that she thought he might be uncomfortable talking about what happened. When asked if he had sex with his ex-girlfriend at his father's house, he replied "no." He also responded "no" when asked if they had fooled around at his father's house.

Detective Skomal then asked Webster what it was he did not want to talk about, and he said that "this whole situation it just irritates me" and that after "everything I've done for her and she just wants to do this to me." When Detective Skomal asked Webster why his friend had said that he saw Webster having sexual contact with the former girlfriend, Webster told her he did not know why his friend would say this and indicated

3

that it was not true. The detective asked Webster if he had falling out with his friend that night, and he said they had not.

At that point, Detective Skomal talked about taking the case to the district attorney because Webster did not want to talk about what happened at his father's house. Webster responded by saying that if the case was sent to the district attorney, nothing would happen because it did not make sense. He also stated that his former girlfriend did not get a rape kit done. Detective Skomal continued to ask Webster about the allegations of sexual contact with his ex-girlfriend at his father's house, and he continued to deny that anything happened.

Detective Skomal asked Webster whether he thought he would be able to pass a polygraph test, and he shook his head in the affirmative. However, when the Detective asked him to take one Webster said he wanted to talk to his father and maybe to an attorney. At that point, Detective Skomal ended the interview, and Webster left the law enforcement center and drove himself home.

At no point during the interview did Webster ask to leave the room or the law enforcement center. Moreover, from a review of the video recording, it does not appear that he ever attempted to get up out of his chair in an attempt to leave. Likewise, Webster was never restrained or placed under arrest. Once the interview ended—which was about 20 minutes after it had begun—Webster left the law enforcement center. At no time did Webster make a confession or admit to having sexual contact with his former girlfriend.

Several months later, on June 17, 2019, the State charged Webster with one count of aggravated sexual battery. In particular, the State alleged that Webster had sexual contact with her when she was incapable of giving consent due to intoxication. On October 18, 2019, the State amended the charges to one count of rape and one count of aggravated criminal sodomy.

4

While the case was pending before the district court, Webster filed a motion to suppress the statements that he made during the January 2019 interview. On February 20, 2020, the district court held an evidentiary hearing. At the hearing, Detective Skomal was the sole witness. In addition, the video recording of the interview was played for the district court. The following day, the district court orally ruled that it was partially granting Webster's motion to suppress.

In a written order filed on February 28, 2020, the district court suppressed any statements Webster made after stating, "I don't want to talk about it." Specifically, the district court found:

> "The State has failed in its burden to prove the statements were voluntarily made. Arguably the interrogation turned from noncustodial to custodial after defendant made this statement. Defendant had been escorted into the interview through 4 doors, at least two of which were locked and opened only with a code possessed by the detective. Detective Skomal instead of advising defendant that she would assist him in leaving continued to question defendant about the alleged crime. Even considering the interrogation to be noncustodial defendant unequivocally invoked his right to cease the questioning and end the interview."

Thereafter, the State filed this interlocutory appeal pursuant to K.S.A. 2019 Supp. 22-3603, which permits an interlocutory appeal from a suppression of evidence when the suppression order substantially impairs the State's ability to prosecute the case. On August 12, 2020, we entered an order to show cause why this appeal should not be dismissed on the ground that no substantial impairment to the State's ability to prosecute had been shown. Both parties filed timely responses. Although this is certainly a close question, we conclude that the State made an adequate showing in its response to allow this interlocutory appeal to go forward under K.S.A. 2019 Supp. 22-3603.

ANALYSIS

The sole issue presented in this interlocutory appeal is whether the district court erred in suppressing a portion of the statements Webster made during his interview with a Reno County Sheriff's detective on January 17, 2019. Our review of a district court's decision on a motion to suppress evidence has two components. First, we review the factual underpinnings of the decision to determine whether they are supported by substantial competent evidence. Second, we review the ultimate legal conclusion de novo. See *State v. Lowery*, 308 Kan. 359, 364, 420 P.3d 456 (2018).

Substantial competent evidence is that which a reasonable person could accept as adequate to support a conclusion. In determining whether the district court's findings of fact are supported by substantial competent evidence, we do not reweigh the evidence, assess the credibility of witnesses, or resolve evidentiary conflicts. See *State v. Boggess*, 308 Kan. 821, 825, 425 P.3d 324 (2018). In addition, in a situation where the material facts are not in dispute—as in this case—the ultimate question of whether to suppress is a question of law over which we have unlimited review. See *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The Fifth Amendment to the United States Constitution provides defendants in criminal prosecutions with protection from self-incrimination, and this protection includes the right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). This right is extended to the States through the Fourteenth Amendment. See *Chavez v. Martinez*, 538 U.S. 760, 766, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003); see also *Malloy v. Hogan*, 378 U.S. 1, 6-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). In addition, the Kansas Legislature has codified the right against self-incrimination in K.S.A. 2019 Supp. 60-460(f). See *State v. Guein*, 309 Kan. 1245, 1261-62, 444 P.3d 340 (2019).

*Miranda* warnings are required to be given to those who are in custody and subject to investigation. See *State v. Warledo*, 286 Kan. 927, 936, 190 P.3d 937 (2008). If a suspect in custody invokes the right to remain silent, a law enforcement officer must cease questioning the subject. *Miranda*, 384 U.S. at 473-74. However, the United States Supreme Court has held that in a noncustodial setting, a law enforcement officer is under no obligation to give a person the Miranda warning, including an admonition that he or she has a right to remain silent. See *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984); *United States v. Abdallah*, 911 F.3d 201, 213 (4th Cir. 2018).

The Kansas Supreme Court has set out a two-pronged test to determine whether a suspect is in custody. First, we look at the circumstances surrounding the interrogation. Second, we ask whether a reasonable person in those circumstances would have felt free to end the interrogation and leave. *State v Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012). There is no bright line rule for determining whether an interview is custodial in nature, and the court must evaluate each case on its own particular facts. *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014).

Factors a court may consider in determining whether an interview or interrogation was custodial include:  (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person questioned is a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, e.g., whether the person was arrested or detained or allowed to leave. 299 Kan. at 835.

On appeal, the State argues that Webster did not unequivocally invoke his right to remain silent simply by saying, "I don't want to talk about it." The State also argues that the giving of *Miranda* warnings under the circumstances presented in this case was not required because Webster was not in custody at the time of the interview. In addition, the State argues that there was no clear invocation of his rights until approximately 19 minutes and 56 seconds into the interview and—at that point—the detective concluded the interview, and Webster left the law enforcement center.

Although it is unclear from the record, it appears that the district court found that the interview was—at least initially—noncustodial in nature. Based on the totality of the circumstances, we agree with that conclusion. In particular, we note that although the interview was conducted in a secured law enforcement facility, the remaining factors suggest that the interview was not custodial in nature:

- The interview lasted only 20 minutes.
- Webster called Detective Skomal to arrange the interview after she left a card at his residence.
- The interview was set for 10 a.m. by mutual agreement.
- Webster arrived at and left the interview on his own accord.
- Detective Skomal was the only officer present in the room during the interview.
- Detective Skomal was in plain clothes and wearing her badge.
- Webster was not physically restrained during the interview.
- At the start of the interview, Detective Skomal told Webster that he was not under arrest.
- Detective Skomal also told Webster that he did not have to talk to her, he was free to end the interview and leave at any time, and he was not under arrest.
- Detective Skomal conducted the interview in a conversational tone.
- Webster had his cellphone with him during the interview.

8

- When Webster indicated that he wanted to speak with his father and possibly to an attorney, the interview was terminated.

- Webster was not detained or arrested at the end of the interview.

These factors support the conclusion that this was not a custodial interview. See *State v. Morton*, 286 Kan. 632, 646-47, 186 P.3d 785 (2008) (noncustodial when defendant drove herself to interview at police station, she was told she was free to leave, she was not restrained, and she was not arrested at the conclusion of the interview); *State v. James*, 276 Kan. 737, 752-53, 79 P.3d 169 (2003) (not custodial when defendant arrived at police station voluntarily, he was questioned as a witness, he was told he was not under arrest, he was not restrained, he had access to his cell phone, and he was arrested at the end of the interview on an outstanding warrant); *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (not custodial when officers drove defendant to the station, interview took place in interview room, defendant was free to go after interview, interview lasted over 2 hours, and defendant not interviewed as a suspect); *State v. Whitt*, 46 Kan. App. 2d 570, 576-77, 264 P.3d 686 (2011) (not custodial when defendant drove himself to police station, only one officer interviewed defendant, defendant not restrained, officer told defendant he was free to leave, interview lasted less than 2 hours, and defendant not arrested at the end of the interview). Thus, we find substantial competent evidence to support the conclusion that the interview was noncustodial in nature and, as a result, *Miranda* warnings were not required to be given to Webster.

Nevertheless, the district court finds in its written order: "*Arguably* the interrogation turned from noncustodial to custodial after defendant [stated, 'I don't want to talk about it.']" (Emphasis added.) Then, the district court goes on to state that "[e]ven considering the interrogation to be noncustodial[,] [the defendant] unequivocally invoked his right to cease the questioning and end the interview." Accordingly, the district court did not find that the otherwise noncustodial interview turned into a custodial interrogation. Rather, it believes that it might have.

Our focus is directed to the 16 minute and 20 second point in the video recording of the interview. It is at that point that Detective Skomal started asking Webster about what happened with his ex-girlfriend at his father's house. Webster did not state that he wanted to end the interview or ask to leave. He also did not mention wanting to call an attorney. Instead, he responded: "I would rather just . . . I don't know . . . like, I don't want to talk about it."

At the suppression hearing, the detective testified that she believed that Webster simply did not want to talk about it because he felt uncomfortable discussing his sexual activity with his former girlfriend. According to Detective Skomal, she did not understand Webster to mean that he was invoking his right to remain silent. As such, she continued to ask him about the events on the night in question. In turn, Webster continued to answer her questions for another few minutes and continued to deny having sexual activity with his ex-girlfriend. In fact, Webster never confessed to any wrongdoing nor did he directly make any inculpatory statements.

In determining the voluntariness of Webster's statements after the point in which he stated, "I don't want to talk about it," we must again consider the totality of the circumstances. *State v. Palacio*, 309 Kan. 1075, 1087, 442 P.3d 466 (2019). The burden is on the State to prove—by a preponderance of the evidence—that statements made to law enforcement officers are voluntary. See *State v. Bridges*, 297 Kan. 989, 1004, 306 P.3d 244 (2013). "The essential inquiry is whether the statement was the product of the free and independent will of the accused." *State v. Groschang*, 272 Kan. 652, 662, 36 P.3d 231 (2001); see *Yarborough v. Alvarado*, 541 U.S. 652, 667-78, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004).

Again, other than the location of the interview—which occurred in a secure area of the law enforcement center—most of the relevant factors support a finding that this interview was not custodial in nature. As previously discussed, Detective Skomal

10

explicitly told Webster that he did not have to talk to her, that he was free to leave at any time, and that he would not be arrested if he decided to leave. Even after he indicated that he did not "want to talk about it," the video recording confirms that Webster continued to talk to Detective Skomal in a conversational manner. As soon as Webster indicated that he wanted to talk to his father and perhaps to an attorney, the detective immediately ended the interview.

The Kansas Supreme Court has found that an invocation of the right to remain silent cannot be ambiguous or equivocal. See *State v. Holmes*, 278 Kan. 603, 617-19, 102 P.3d 406 (2004); see *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). So it was incumbent on Webster to clearly and unequivocally make his desire known to Detective Skomal if he truly wanted to end the interview. Moreover, when a suspect makes a statement which is unclear, a law enforcement officer may ask clarifying questions or choose to continue the interview. See *State v. Cline*, 295 Kan. 104, 113, 283 P.3d 194 (2012).

We find Webster's statement that "I don't want to talk about it" when asked about any sexual activity he may have had with his ex-girlfriend to be similar to the statement made by the defendant in *State v. Fritschen*, 247 Kan. 592, 606, 802 P.2d 558 (1990). In *Fritschen*, the defendant—who was being interviewed at the Hutchinson Law Enforcement Center regarding a homicide—was told that he could terminate the interview and was free to leave at any time. During the interview, the defendant stated, "I don't want to talk about [the homicide] anymore, it hurts too much." 247 Kan. at 606. However, after making this statement, the defendant continued to talk to the officers. Our Supreme Court concluded that the defendant's "statement does not even reach the level of a potentially ambiguous request to remain silent" and that he "was saying he was upset and having difficulty talking." 247 Kan. at 607.

11

Similarly, in *State v. Kleypas*, 272 Kan. 894, 924, 40 P.3d 139 (2001), the Kansas Supreme Court found the defendant's statement to law enforcement officers that "I think that might be all for you" to be ambiguous and not to reflect an unequivocal desire to end the interview. Also, in *State v. McCorkendale*, 267 Kan. 263, 273, 979 P.2d 1239 (1999), our Supreme Court found the defendant's statement, "So that's all I [got] to say," to be ambiguous. Here, Webster gave no clear indication or signal—by his words or actions—that he desired to terminate the interview or was invoking his right to remain silent.

By way of contrast, in *State v. Morse*, No. 108,429, 2013 WL 2992140, at *4 (Kan. App. 2013), a panel of this court found the statement that "I think we're done here" was sufficient to invoke his right to remain silent when coupled with the suspect waving his arms as if to cut off any further questions. In the present case, Webster did not make any similar gestures. Rather, he continued to sit at the table without giving any indication that he wanted to leave the room. In addition, the statement that he did not want to talk about what happened at his father's house was immediately premised with the words "I don't know"—which are words that suggest uncertainty rather than an unambiguous request to remain silent.

It is also important to recognize that Detective Skomal asked Webster for clarification after he said that he did not "want to talk about it." Specifically, she asked: "What is it you don't want to talk about?" And Webster responded:  "Just the whole situation . . . just is . . . it irritates me because, like I said everything I've done for this chick and then like our past and she wants to go and do this like . . ." Webster went on to say, "that's not me" and continued to deny ever having inappropriate sexual activity with his ex-girlfriend. Accordingly, the detective's belief that Webster was willing to continue to talk to her was reasonable when his statements are viewed in context.

In summary, we agree with the district court that the interview was noncustodial in nature at the outset. In addition, based on our review of the undisputed facts as gleaned

from the video of the interview, we find that Webster did not clearly and unequivocally invoke his right to remain silent at the point that he states he did not want to talk about what happened. See *State v. Holmes*, 278 Kan. at 617-19; see also *Thompkins*, 560 U.S. at 381-82. Accordingly, we conclude that the district court erred as a matter of law in ruling on the motion to suppress. In reaching this conclusion, we are not saying that the statements made by Webster during the interview will necessarily be admissible at the trial of this case. That decision should be left to the district court based on the arguments presented by counsel as the case moves forward. Rather, we are only deciding the issue presented in this interlocutory appeal relating to the suppression motion.

Reversed and remanded for further proceedings.

\* \* \*

ATCHESON, J., dissenting: In its written order granting in part Defendant Joe Garcia Webster III's motion to suppress, the Reno County District Court identified and then declined to decide a key factual issue—apparently concluding its ruling was otherwise legally sufficient. The district court's supposition was mistaken, and the order fails to lay out a complete rationale for the outcome. The majority takes it upon itself to decide the suppression motion and in doing so makes the factual determination the district court deliberately left unresolved and overrides another significant mixed question of fact and law the district court did decide. In this situation, the proper course would have been to remand to the district court with directions to make the necessary findings of fact and concomitant conclusions of law based on the existing evidentiary record. I, therefore, respectfully dissent from the majority's decision to reverse as both premature and an unwarranted intrusion on the district court's role as the finder of fact.

Webster moved to suppress statements he made to Reno County Sheriff's Detective Diana Skomal when she questioned him for about 20 minutes in a cloistered

13

interview room in the basement of the law enforcement center behind at least two sets of locked doors. At the time, Skomal had more than sufficient evidence to support the charges of rape and aggravated criminal sodomy against Webster. So he was plainly a suspect, and the purpose of the interview was not investigatory.

As the majority points out, Webster arranged the time for the interview with Skomal and arrived at the law enforcement center on his own. Webster was not handcuffed or otherwise personally restrained during the interview, although he could not have left the building without help navigating the locked security doors. He retained his cell phone and departed at the conclusion of the questioning.

Of particular significance here, Skomal did not inform Webster of his *Miranda* rights or secure a waiver of them. At the start of the interview, Skomal told Webster he was not under arrest and could leave whenever he wanted. She also told him, "[Y]ou can say I don't want to talk about it." That approximates a common iteration of one of the *Miranda* rights—the suspect may stop answering questions at any time. See *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see, e.g., *Duckworth v. Eagan*, 492 U.S. 195, 198-99, 202 n.4, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989); *State v. Aguirre*, 301 Kan. 950, 958-59, 349 P.3d 1245 (2015).

About 16 minutes into the questioning, Skomal asked Webster what happened at his father's house, where the victim said the sexual assault took place. Webster told Skomal, "I would rather just . . . I don't know . . . like, I don't want to talk about it." Skomal then continued to ask Webster questions about the circumstances and why he didn't want to talk about them. A few minutes later, when Skomal challenged Webster to take a polygraph test, he said he wanted to talk to his father and perhaps a lawyer. Skomal then ended the interview. Webster was escorted out of the law enforcement center.

14

At the suppression hearing, Skomal testified, and the State had a videotape of Skomal's questioning of Webster admitted as an exhibit. The district court received no other evidence. Although Webster's motion to suppress isn't a model of clarity, he seems to argue that all or some part of the questioning was custodial, therefore, requiring he be informed of and waive his *Miranda* rights. And he argues all or at least some of his statements were not voluntary. Involuntariness and lack of *Miranda* warnings are independent legal grounds each of which would limit or preclude the State's use of Webster's statements against him during a trial. The district court's ruling, however, collapses them into an undifferentiated and incomplete analysis of the facts leading to a rationale and result that cannot readily be reviewed on appeal.

In reviewing a ruling on a motion to suppress, we customarily apply a bifurcated standard giving deference to the district court's findings of fact so long as they have support in the evidence and then making an independent determination whether those findings warrant the district court's legal conclusion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The majority effectively short-circuits that process to make factual findings the district court omitted or to negate findings that seem to be supported in the record.

To place the problem with the district court's order in context, several legal principles need to be laid out:

• During "custodial" interrogations, individuals have a right to refuse to answer questions government agents put to them. If government agents conduct a custodial interrogation, they must first inform the individual of certain constitutional protections commonly known as the *Miranda* rights. *Miranda* 384 U.S. at 444-45; *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012). An individual is considered in custody if a reasonable person in the same situation would conclude he or she was not free to terminate the encounter and leave. *Miranda*, 384 U.S. at 444, 478-79; *Stansbury v.*

15

*California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *Warrior*, 294 Kan. at 497. The determination rests on the totality of the circumstances, although the courts have identified a set of pertinent factors channeling the judicial inquiry. See 294 Kan. at 496-97.

• If an encounter between an individual and a government agent is not custodial, the individual may simply end the meeting. See *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (voluntary encounter); *State v. McKeown*, 249 Kan. 506, 509-10, 819 P.2d 644 (1991). As a general matter, individuals have no obligation to answer questions government agents ask them during noncustodial meetings.

• An individual's statement to government agents is considered involuntary if it is the product of impermissible coercion negating that person's free will. See *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 3, 4, 276 P.3d 165 (2012); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). A government agent may induce an involuntary statement through improper threats of harm, promises of benefit, a combination of the two, or other undue influence over the individual. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976); *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008). Whether a statement has been given voluntarily or involuntarily rests on a judicial evaluation of the factual circumstances and tends to focus on factors comparable to those used to evaluate when an encounter may be custodial. See *State v. Spagnola*, 295 Kan. 1098, 1107-08, 289 P.3d 68 (2012) (voluntariness of consent); *State v. Thompson*, 284 Kan. 763, 812-13, 166 P.3d 1015 (2007).

• Statements made to government agents during a custodial interrogation are not inherently involuntary. In other words, simply being in custody does not amount to undue coercion in and of itself. *State v. Horn*, No. 114,078, 2016 WL 7494377, at *3 (Kan. App. 2016) (unpublished opinion). The required explanation of the *Miranda* rights to an individual in custody aims to keep a custodial interrogation from becoming impermissibly coercive—assuming, of course, the government inquisitors then scrupulously honor them. *Miranda*, 384 U.S. at 456-58, 467-69.

• Statements made to government agents in a noncustodial setting are not automatically voluntary for that reason. They still may be the product of improper coercion, such as promises of leniency or threats of retaliation or other harm. See *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976) (recognizing that particular circumstances could render a suspect's statements to government agents involuntary even though interrogation was not custodial); *United States v. Preston*, 751 F.3d 1008, 1013, 1015-16 (9th Cir. 2014); *United States v. Brave Heart*, 397 F.3d 1035, 1040-41 (8th Cir. 2005); *United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994).

• Involuntary statements are considered intrinsically unreliable, so the government may not use them in the prosecution of the individual who made them. *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009); *Mincey v. Arizona*, 437 U.S. 385, 397-98, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011). The rule is categorical.

• If government agents fail to inform individuals of their *Miranda* rights during custodial interrogations, any otherwise voluntary statements the individuals give cannot be used against them as part of the prosecution's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 317-18, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *United States v. Smith*, 831 F.3d 793, 798 (7th Cir. 2016). The prohibition imposes a detriment on the government

17

designed to induce its agents to inform suspects of their constitutional rights as required by *Miranda*. But because the statements are voluntary and, thus, intrinsically reliable despite the absence of *Miranda* warnings, the government may use the statements to impeach defendants, should they testify differently at trial. *Mincey*, 437 U.S. at 397-98; *United States v. Rosales-Aguilar*, 818 F.3d 965, 969-70 (9th Cir. 2016).

Turning to the decision on Webster's motion to suppress, the district court stated in a brief oral ruling that Skomal's questioning of Webster was not custodial up to the point he said he did not want to talk about what happened at his father's house. Although not expressly repeated in the district court's written order, that finding is implicit. And the district court implicitly found the questioning was not impermissibly coercive at least until then, rendering those statements voluntary.

Having viewed the videotaped interview and having heard Skomal testify about the questioning, the district court found that Webster "unequivocally invoked his right to cease the questioning" when he said he didn't want to talk about what happened at his father's house. The finding presumably has substantial support in the evidence based on the tenor of the questioning and Webster's demeanor, as the district court gleaned them from the videotape. Moreover, Webster employed the very phrase—"I don't want to talk about it"—Skomal told him he could use to stop the questioning. At the hearing, Skomal testified that she didn't think that's what Webster meant. The district court was, however, free to discount or disregard entirely the detective's explanation for why she continued to question Webster.

The district court did not, however, outline the factual underpinnings for its determination. But we overstep our authority as a reviewing court to find otherwise on this record. An appellate court is obligated to defer to what a district court reasonably discerns from recorded evidence, such as a videotape of an interrogation or a dash cam of a traffic stop. See *State v. Garcia*, 297 Kan. 182, 186-88, 301 P.3d 658 (2013) (appellate

18

review of ruling on motion to suppress when police questioning of defendant has been videotaped requires deference to district court's findings of fact drawn from recording, even though record on appeal includes video); see also *Casper v. Kansas Dept. of Revenue*, 309 Kan. 1211, 442 P.3d 1038 (2019) (video recording of traffic stop). We, likewise, have no business reevaluating the testimony of witnesses. See *State v. Appleby*, 289 Kan. 1017, 1038, 221 P.3d 525 (2009); *State v. Hartpence*, 30 Kan. App. 2d 486, 492-93, 42 P.3d 1197 (2002).

The district court's abbreviated factual finding is just that—abbreviated. But the lack of detail is not a license for us to make the underlying findings as we chose and to jettison the district court's factual conclusion. Rather, we should recognize the district court's handiwork to be inadequately detailed for us to review and remand for the requisite clarity and particularity that will allow us to make a meaningful examination of the issue consistent with our role as an error correcting court. See *State v. Neighbors*, 299 Kan. 234, 240-41, 328 P.3d 1081 (2014) (remand for additional findings if issue cannot otherwise be resolved on appeal); *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013) (district court has "primary duty to provide adequate findings and conclusions" and appellate court may remand for "additional findings and conclusions"). The majority goes too far in taking up and, on this record, rejecting the district court's finding that Webster invoked his right to remain silent when he told Skomal he didn't want to talk about what happened at his father's house.[*]

[*]I am not especially inclined to agree with the majority's analysis that Webster failed to invoke his right to remain silent. First and foremost, of course, we shouldn't be deciding the issue at all at this juncture. Second, I would defer to the district court's additional factual findings in undertaking a review of the merits. And finally, the cases the majority cites are distinguishable on their facts from the circumstances here. The words used can't be divorced from their factual setting, and the ultimate determination is especially fact-bound.

19

The district court also failed to integrate its finding that Webster invoked his right to stop answering questions into a complete legal analysis supporting the suppression of the statements he made during that last few minutes of the interview with Skomal. As the majority mentions, the district court stated that the questioning "[a]rguably . . . turned from noncustodial to custodial" after Webster said he didn't want to talk about what happened at his father's house. I take that to mean the district court concluded it didn't need to determine whether the encounter had become custodial to justify its suppression ruling. The district court alludes to factual circumstances that tend to support a transition from a noncustodial encounter to a custodial one when Skomal continued to question Webster despite his declination in the words she had invited him to use for that purpose.

If the questioning became custodial at that point, Skomal was then obligated to advise Webster of his *Miranda* rights, and she did not. That would be a sound legal basis for precluding the State from using Webster's statements in its case-in-chief at a trial. But the district court simply deferred the requisite finding and never directly addressed suppression for a *Miranda* violation. The district court should be given the opportunity to make the relevant factual findings and legal conclusions—one way or the other. The majority again oversteps to make a factual finding that the entire interview was not custodial.

The district court took an alternate route to order suppression of the statements assuming the interview remained noncustodial. The district court reasoned that because Webster invoked his right to remain silent and Skomal continued to question him in a noncustodial setting, the statements, therefore, must have been the product of a violation of Webster's constitutional rights. But that conclusion doesn't necessarily follow from those premises—what the district court has described does not add up to a legal basis to suppress. If the questioning were noncustodial, Webster could have declined to answer. But Skomal would have been under no obligation to stop questioning him. Webster, of course, could have continued to refuse to answer—just as he could have if the interview

20

were custodial. And he could have put an end to the questioning by leaving—something he could not have done if the interview were custodial.

If the questioning of Webster were noncustodial throughout, the district court would have had to find that the statements were the product of impermissible coercion and, thus, involuntary to order their suppression. The district court didn't reject that possibility; it didn't formally address it, even though the motion to suppress alludes to voluntariness and the written ruling mentions some legal principles bearing on voluntariness. Again, the absence of pertinent factual findings and a discussion tying those missing findings to the district court's legal conclusion precludes meaningful appellate review.

The proper remedy is to remand for the district court to make sufficient findings and conclusions. Some or all of those findings, of course, might be contrary to some or all of Webster's legal arguments. But the order would present fully articulated findings and conclusions that could be reviewed on appeal for legal error. (We would not review a ruling adverse to Webster on his motion to suppress on an interlocutory basis. It would be a potential issue for appeal if he were convicted at trial, along with any claimed trial errors.)

In short, the district court failed to outline a factual predicate supporting its legal conclusion, especially when it declined to say whether Skomal's questioning of Webster became custodial at some point. But the district court didn't make findings precluding relief for Webster; that would render its decision to suppress a legal error we could correct on the State's appeal. Rather, the district court simply did not address one way or the other factual circumstances necessary to decide the suppression issue and, in turn, to support its legal conclusion. We, as an appellate court, should not and really cannot step into that breach to decide the motion to suppress.

21

For the reasons I have outlined, the appropriate disposition of the State's appeal requires a remand to the district court for adequate factual findings tied to a more detailed expression of the legal conclusion warranting partial suppression. Only then could we actually review the district court's determination for legal error rather than deciding the suppression issue by substituting the findings and conclusions we might make were we hearing the motion in the first instance, as the majority has done in reversing the ruling.